UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHRISTIAN MIRON, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:11-CV-446 (VLB) |
| | : | |
| TOWN OF STRATFORD, | : | |
| STRATFORD POLICE DEPARTMENT, | : | |
| ORLANDO SOTO, JOSEPH MCNEIL, | : | |
| and SHAWN FARMER, | : | |
| Defendants. | : | September 30, 2013 |

MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. #199]

I.     Introduction

The Plaintiff, Christian Miron ("Miron"), brings this action for alleged

federal and state violations of his rights stemming from the public release of a

background investigation report prepared for the purposes of assessing Miron's

suitability to become a police officer with the Stratford Police Department

("SPD").  At this stage of the litigation, seven broad claims remain against

Stratford Police officers Orlando Soto ("Soto"), Joseph McNeil ("McNeil"), and

Shawn Farmer ("Farmer") in their individual capacities only.  Miron alleges claims

against the Defendants for deprivation of his constitutional privacy rights

pursuant to 42 U.S.C. § 1983 (counts 1 – 3); deprivation of his First Amendment

right to freedom of association pursuant to 42 U.S.C. § 1983 (counts 5 – 7);

violations of Connecticut's computer crimes statute as encompassed in Conn.

Gen. Stats. §§ 53a-251 (enforced through Conn. Gen. Stat. § 52-570b) and § 53-451

(enforced through Conn. Gen. Stat. § 53-452) (counts 9 – 14); common law

1

invasion of privacy (counts 15 – 17); civil conspiracy (counts 18 – 20); and tortious interference with business relations (counts 21 – 23).  Currently pending before the court is the Defendants' Motion for Summary Judgment.  For the reasons that follow, the Defendants' Motion is GRANTED IN PART AND DENIED IN PART.

## II.   Rule 56 Statements

As an initial matter, the Court notes that both the Plaintiff and the Defendants have failed to comply with the Federal Rules of Civil Procedure for asserting and contesting facts on a motion for summary judgment.  The Federal Rules provide that

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).  Moreover, "[t]he court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

Rule 56(a) of the Local Rules of Civil Procedure for the District of Connecticut makes clear the procedure for prosecuting and opposing a motion for summary judgment.  A party filing a summary judgment motion must annex a

"concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried."  D. Conn. L. Civ. R. 56(a)1.  Local Rule 56(a)2 further makes the opponent's duty abundantly clear by stating that a party opposing a motion for summary judgment must file an answering document which states "whether each of the facts asserted by the moving party is admitted or denied" and must also include a "list of each issue of material fact as to which it is contended there is a genuine issue to be tried."  D. Conn. L. Civ. R. 56(a)2. Each statement of material fact in a Local Rule 56(a)1 or Local Rule 56(a)2 statement, as well as each denial in a summary judgment opponent's Local Rule 56(a)2 statement, "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."  D. Conn. L. Civ. R. 56(a)3.  The Local Rule further clarifies that "[a]ll material facts set forth in [a moving party's 56(a)1] statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party."  D. Conn. L. Civ. R. 56(a)1.  Where a party fails to appropriately deny material facts set forth in the moving party's 56(a)1 statement, and where those facts are supported by evidence in the record, those facts are deemed to be admitted.  *See SEC v. Global Telecom Servs. L.L.C.*, 325 F. Supp. 2d 94, 109 (D. Conn. 2004); *Knight v. Hartford Police Dep't*, 3:04CV969 (PCD), 2006 WL 1438649 (D. Conn. May 22, 2006).

The parties here have submitted Local Rule 56 Statements that cite to evidence in the record, but that are incomplete in that they do not provide the Court with a full view of the events forming this action.  Both parties have further

proffered statements or portions of statements in their 56 Statements and briefs unsupported by the evidence to which they cite.  The parties also cite to evidence in the bodies of their briefs that does not appear in their Rule 56 Statements.  Moreover, the parties have submitted hundreds of pages of evidence but cite specifically to a mere fraction.  Lastly, Defendants have made a number of impermissible legal conclusions in their 56(a)1 Statement and Plaintiff has done the same in his Statement of Disputed Issues of Material Fact.  [See Dkt. 199-1, Ds' 56(a)1 Stmnt. ¶¶34, 35, 37, 38, 39, 40, 41; Dkt. 203-1, P's 56(a)2 Stmnt. Disputed Fact ¶12].

Thus, the court will take as true relevant facts that are supported by admissible evidence in the record but will not credit statements or portions of statements that are unsupported by the evidence cited.  The court will cite directly to the evidence cited by the parties where appropriate, and will consider evidence cited in the parties' briefs where such evidence assists the court in understanding the facts of this case or where an omission of such fact would materially alter the Court's conclusions.  The court will not consider evidence in the record to which the parties have not cited, and will also disregard any legal conclusions in the parties' 56 Statements.  The court will note disputes as to facts.

III.    **Factual Background**

At all times relevant to  this action, Defendant Orlando Soto was employed as a Lieutenant in the SPD, Joseph McNeil was a Captain in the SPD and Vice

President of the Stratford Police Union Local 407 (the "Union"), and Shawn Farmer was a sergeant in the SPD and the President of the Union.  [Dkt. 199-1, Ds' 56(a)1 Stmnt. ¶¶3, 4, 5; Dkt. 203-1, P's 56(a)2 Stmnt. ¶3, 4, 5].

In or around October 2007, the Plaintiff, Christian Miron, applied for a position as a police officer with the Stratford Police Department.  [Dkt. 199-1, Ds' 56(a)1 Stmnt. ¶6; Dkt. 203-1, P's 56(a)2 Stmnt. ¶6].  At the time the Plaintiff applied for this position with the SPD, his brother, James Miron, was the Mayor of the Town of Stratford.  [Dkt. 199-1, Ds' 56(a)1 Stmnt. ¶7; Dkt. 203-1, P's 56(a)2 Stmnt. ¶7].  The Plaintiff has testified and the evidence confirms that in March 2008 the SPD extended Miron a verbal offer of employment which was later confirmed by letter dated April 18, 2008.  [Dkt. 203, P's Opp. to Ds' MSJ, pp. 3-4; Dkt. 203-8, Exh. 5, Miron Depo. 254:4-9; Dkt. 203-11, Exh. 8, Offer Letter].

Lieutenant Soto and Captain McNeil both sat on the Chief's oral Interview Panel with Christian Miron.  On the attendant "Candidate Interview Sheets" dated February 5, 2008, Soto noted that he recommended Miron for hire by the SPD, and McNeil highly recommended him.  [Dkt. 199-1, Ds' 56(a)1 Stmnt. ¶33; Dkt. 203-1, P's 56(a)2 Stmnt. ¶33].  Sergeant Farmer testified that he agreed it would be a good idea to have the Mayor's brother in the SPD.  [Dkt. 199-1, Ds' 56(a)1 Stmnt. ¶35; Dkt. 203-1, P's 56(a)2 Stmnt. ¶35].  The record does not indicate that either Soto or McNeil had read Miron's background investigation report (which was finalized on March 21, 2008) at the time they made these recommendations; and the report itself notes that Miron's background investigation commenced on February 10, 2008.  [Dkt. 210, Exh. K, Incident Report 08-3321, p.1 (sealed)].

As part of the hiring process for a position with the Stratford Police Department, Christian Miron was required to and did sign an Authorization for Release of Personal Information authorizing, in relevant part,

> a review of and full disclosure of all records or any part thereof, concerning myself, by and to Lt. Freer, of the Stratford Police Department, whether said records are of a public, private or confidential nature.

[Dkt. 199-1, Ds' 56(a)1 Stmnt. ¶10; Dkt. 203-1, P's 56(a)2 Stmnt. ¶10; Dkt. 199-4, Exh. B, Miron authorization].  This Authorization further states, in relevant part,

> [t]he intent of this authorization is to give my consent for full and complete disclosure of the records of . . . medical and psychiatric treatment and/or consultation . . . employment and pre-employment records, including background reports. . . . It is the intent of this authorization to provide full and free access to the background and history of my personal life, for the specific purpose of pursuing a background investigation that may provide pertinent data for the Police Department to consider in determining my suitability for employment by that Department.  It is my specific intent to provide access to personal information, however personal or confidential it may appear to be, and the sources of information specifically enumerated above are not intended to deny access to any records not specifically mentioned herein.  I hereby release you, your organization or others from liability or damage that may result from furnishing the information requested.

[Dkt. 199-1, Ds' 56(a)1 Stmnt. ¶10; Dkt. 203-1, P's 56(a)2 Stmnt. ¶10; Dkt. 199-4, Exh. B, Miron authorization].

At the time Mr. Miron submitted his application to the SPD, the SPD had in place policy 7.14, regarding processing of official reports, which was issued in 1994.  [Dkt. 199-1, Ds' 56(a)(1) Stmnt. ¶19; Dkt. 203-1, P's 56(a)(2) Stmnt. ¶19].

Policy 7.14 states that its purpose is to "establish procedures for reviewing, controlling, maintaining, and retrieving all incident reports submitted by employees of the Stratford Police Department." [Dkt. 199-12, Exh. J, Incident Report Policy p. 1]. It contains a section entitled "Control of Reports," which reads in relevant part:

> Original case file reports will not be removed from the records division for any reason. Reports will, under normal conditions, be released by records division staff only.
>
> Department personnel will request copies of records through the records division commander. The records division personnel will make the copies and deliver them to the requesting officer as soon as possible. Copies are not to be made without the knowledge and consent of the records division commander or the commanding officer.
>
> Records information will be accessible to police operational personnel at all times. Officers may, if necessary, request records division personnel to make copies of reports for investigative purposes, preparation for court, or other lawful purposes.
>
> Access to the records will be only with the knowledge and consent of the commanding officer when the records division commander is not available.
>
> Release of records will meet Freedom of Information restrictions, as well as all Connecticut General Statutes. Requests for Criminal History Information will be supplied pursuant to the Freedom of Information Act in accordance with Connecticut General Statute 1-15.

[Dkt. 199-12, Exh. J, Incident Report Policy p. 2].

Miron's background investigation was assigned Incident Report number 08-3321 and a file with that number was created in the SPD's Hunt computer

system, the system in which incident reports were generated.  [*See* Dkt. 199-1, Ds' 56(a)1 Stmnt. ¶12; Dkt. 203-1, P's 56(a)(2) Stmnt. ¶12; Dkt. 199-21, Exh. S, Buturla Depo. 18:14 – 19:1; 85:16-24].  The final nine-page Incident Report, which was filed on the Hunt system and completed on March 21, 2008, contained a narrative by Detective Grindrod discussing, inter alia, the results of a psychological examination and a polygraph test Miron was required to undergo in connection with his application along with a psychologist's recommendation as to his hire, details about Miron's financial and academic history, information regarding past drug use, Miron's medical history, and his response to a question regarding sexual intercourse, as well as criminal and investigatory information on two of Miron's family members.  [Dkt. 210, Exh. K, Incident Report 08-3321 (sealed); Dkt. 199-19 Exh. Q, Popik Depo. 59:7-18].  Detective Grindrod noted in the background investigation report that Miron's background investigation began on February 10, 2008.  [Dkt. 210, Exh. K, Incident Report 08-3321, p.1 (sealed)].

In or around March 27, 2008, Incident Report number 08-3321 from the Hunt computer system, which included Plaintiff's background investigation report, was sent in an envelope to Michael Henrick, the Chairman of the Town Council of Stratford, and to other Council members, with a cover letter signed "The very disgusted residents of the Town of Stratford."[1]  [Dkt. 199-1, Ds' 56(a)(1) Stmnt. ¶¶ 8, 9, 12; Dkt. 203-1, P's 56(a)2 Stmnt. ¶¶ 8, 9, 12 ]. The cover letter charges that the "amount of negative aspects" of Miron's background investigation would have disqualified any other applicant from employment as an officer were it not for

---

[1] The cover letter is addressed to "Council Members and Media Personnel."

Miron's relationship to Stratford's mayor.  It notes concern that Miron's disclosed 5% neck disability may lead to future disability pension payouts, and concern that Miron's use of marijuana within two years of his application and his receipt of numerous recent traffic tickets would affect his ability to act safely as an officer entrusted with a weapon and a vehicle.  The letter further noted as cause for concern Miron's polygraph results, which demonstrated a "physiological reaction" to driving after drinking and to physical condition questions which the report noted could warrant further background investigation.  The copy of the background report sent to the Council was dated March 25, 2008 in the bottom right corner and was nine pages long.  [Dkt. 203, P's Opp. to Ds' MSJ, p.8; Dkt. 203-9, Exh. 6, LoSchiavo Depo. 262:21 – 263:6; Dkt. 203-3, Exh. 2, Internal Investigation Executive Summary, p.7; Dkt. 210, Exh. K, Incident Report 08-3321 (sealed)].  It contained, along with the information noted previously, a summary of the somewhat negative results of Miron's psychological evaluation required as a part of his application to the SPD, and in which the mental health professional who performed the report recommended Miron for employment, but "with strong reservations for a police officer position."  [Dkt. 210, Exh. K, Incident Report 08-3321 (sealed)].

After its release to the Council, the Council discussed Miron's background investigation report at a Town Council Meeting open to the public, Henrick discussed Miron's background report with members of the media, and various news outlets (both print and television) featured stories about the leak of Miron's background report, which included discussions of the report's contents.  [Dkt.

199-21, Exh. S, Buturla Depo. 31:17 – 32:10; Dkt. 203-3, Exh. 2., News Articles, pp.58-62; Dkt. 203-7, Exh. 4, Miron Aff. ¶¶12,13].

As a result of the publicity stemming from the release of his background investigation, the Plaintiff was not placed in the Connecticut Police Academy, and was not among the group of new officers hired by the SPD.[2]  [Dkt. 203-8, Exh. 5, Miron Depo. 270:25 – 271:6; Dkt. 199-21, Exh. S, Buturla Depo. 60:15 – 61:11].

Captain Popik testified that he reviewed Miron's background report and discussed with Deputy Chief LoSchiavo his opinion that Miron should not be hired because of Miron's response during the application process to a question about marijuana use, which Popik described as "one of the questions that normally eliminate people from candidacy."  [Dkt. 199-1, Ds' 56(a)1 Stmnt. ¶¶21, 23; Dkt. 203-1, P's 56(a)2 Stmnt. ¶¶21, 23; Dkt. 199-19 Exh. Q, Popik Depo. 50:9 – 52:25].  Specifically, Plaintiff admitted to smoking marijuana within two years of applying for a position as a police officer.  [Dkt. 199-1, Ds' 56(a)1 Stmnt. ¶22; Dkt. 203-1, P's 56(a)2 Stmnt. ¶22].  Captain Popik also testified that on March 21, 2008 he accessed Miron's background report and had the report open on his computer for two hours before locking access to it in the Hunt system; he testified that he did not use his computer for these two hours.  [Dkt. 199-1, Ds' 56(a)1 Stmnt. ¶29; Dkt. 203-1, P's 56(a)2 Stmnt. ¶29; Dkt. 199-19 Exh. Q, Popik Depo. 58:8-13].

---

[2] After the release of the background report, Chief Buturla testified that "based on the disclosure of all the information, it was a mutual decision [between him and the Plaintiff] that he would not proceed further [to the Police Academy] at that point" as "having his background disclosed to the public could potentially give him additional challenges as a police officer."   [Dkt. 199-21, Exh. S, Buturla Depo. 60:15 – 61:11].

On March 27, 2008 Popik sent an email to several SPD officers stating that "narratives for candidate background checks will no longer be put into the HUNT [computer] system," although case numbers for the backgrounds would still be generated in the computer system.  [Dkt. 199-1, Ds' 56(a)1 Stmnt. ¶20; Dkt. 203-1, P's 56(a)2 Stmnt. ¶20].

All three Defendants admit accessing or reviewing Christian Miron's background investigation report.  [Dkt. 199-1, Ds' 56(a)1 Stmnt. ¶16; Dkt. 203-1, P's 56(a)2 Stmnt. ¶16; *see also* Dkt. 199-2, Ds' MSJ p.12].

The Plaintiff has offered a timeline of events from March 25, 2008 supported by closed circuit video evidence and the log of access to Miron's background report offered into evidence by the Defendants themselves. Although the Defendants contend that the evidence presented is not credible in terms of time and is non-dispositive, they do not deny the existence of the evidence.

The access log provided by Defendants indicates that Defendant Soto accessed Miron's background report on the Hunt system at 17:43 on March 25, 2008.  [Dkt. 199-16, Exh. N, Report Access List; Dkt. 203, P's Opp. to Ds' MSJ, p.5]. Closed circuit video evidence presented by the Plaintiff shows that, at 17:42:32[3] on March 25, Defendant Soto walked to the front/sergeants' desk, behind which

---

[3] The Court notes that this time is before the time at which the record indicates that Defendant Soto accessed Miron's background report on the Hunt system.  As further discussed later in this opinion, the times printed on the access log derive from individual computer towers in the Stratford Police Department, and not from a centralized server or system.  The towers are not synchronized.

Sergeant Farmer was sitting.[4]  [Dkt. 203-1, P's 56(a)2 Stmnt. Disputed Fact ¶1].

While at the window, the video appears to show Soto handing a slip of paper to

Farmer around 17:44:10.  [Dkt. 203-1, P's 56(a)2 Stmnt. Disputed Fact ¶2].  Plaintiff

claims that this piece of paper contained the report number of Miron's

background report; although the court notes that this slip of paper cannot be

read.  According to the access log provided by Defendants, Farmer then

accessed Miron's background report at 17:46, while Soto was present at the

window and intermittently speaking with Farmer.  [Dkt. 203-1, P's 56(a)(2) Stmnt.

Disputed Fact ¶¶3, 4; Dkt. 199-16, Exh. N, Report Access List].  Soto can be seen

leaving the front desk area at approximately 17:48.  [Dkt. 203-6, P's Exh. 3,

manually filed SPD video, camera 14 (17:48)].

At approximately 18:10, Sergeant Farmer exited the front desk area through

the back door leading to the SPD's records area, one of two routes Farmer has

testified could be taken to reach Joseph McNeil's office.  [Dkt. 203, P's Opp. to Ds'

MSJ, p.6; Dkt. 203-6, P's Exh. 3, manually filed SPD video, camera 14 (18:10:28);

Dkt. 199-22, Exh. T, Farmer Depo. 88:11-19; 85:21 – 86:21].  Plaintiff alleges that

Farmer left the front desk area, walked to McNeil's office, and handed McNeil a

slip of paper with Plaintiff's background report number on it.  [Dkt. 203-1, P's

56(a)(2) Stmnt. Disputed Fact ¶5].  Joseph McNeil's deposition testimony, to

which Plaintiff cites, supports this assertion:

---

[4] Both Soto and Farmer have verified their identities on the video evidence
referenced.  [[Dkt. 203-1, P's 56(a)2 Stmnt. Disputed Fact ¶1; Dkt. 199-25, Exh. W,
Soto Depo. 74:23 – 77:9; Dkt. 199-22, Exh. T, Farmer Depo. 78:8-21].

Q: And what did you speak with Shawn Farmer about on that date, March 25, 2008?

A: He asked me if [Miron] was hired.

Q: What did you tell him?

A: I didn't know.

Q: Did he say anything else to you?

A: He asked me to, gave me a case - - a slip of paper with the case number on it, asked me to check, give my opinion.

Q: And that was the number of the Miron report?

A: Correct.

Q: And did you access the Miron report once he gave you that number?

A: Yes.

Q: Was he in the room when you accessed it?

A: I don't recall.

[Dkt. 203-1, P's 56(a)2 Stmnt. Disputed Fact ¶5; Dkt. 199-26, Exh. X, McNeil Depo. 29:2-17]. At his deposition, Farmer did not dispute that he may have given McNeil the number of Miron's background report:

Q: Did you ever give the report number for the Christian Miron background report to any other officer at the Stratford Police Department?

A: No.

Q: But you're not disputing that you may have given it to Joseph McNeil, correct?

A: I may have.

[Dkt. 203-1, P's 56(a)2 Stmnt. Disputed Fact ¶5; Dkt. 199-22, Exh. T, Farmer Depo. 85:9-15].

The access report provided by the Defendants indicates that McNeil accessed the Plaintiff's background report at 18:11 on March 25, 2008.  [Dkt. 199-16, Exh. N, Report Access List].  A printer log from March 25, 2008 demonstrates that McNeil printed a nine page document at 6:12 pm (or 18:12 pm), and McNeil testified that, at the time he accessed Miron's background report, which the access log demonstrates was at 18:11 pm, he printed a copy of the report.[5]  [Dkt. 203, P's Opp. to Ds' MSJ, p.7; Dkt. 203-3, Exh. 2, Printer Log p. 99; Dkt. 199-26, Exh. X, McNeil Depo. 30:9-11].  Closed circuit video shows Sergeant Farmer returning to the front desk area at approximately 18:12:30 on March 25 with documents in his hand.  [Dkt. 203, P's Opp. to Ds' MSJ, p.7; Dkt. 203-6, P's Exh. 3, manually filed SPD video, camera 14 (18:12:30)].

The access log demonstrates that the report was accessed once again by Soto at 19:19; and again by McNeil – but with Grindrod's badge number – at 20:11.  [Dkt. 199-16, Exh. N, Report Access List].  According to this access log, no one other than Soto, Farmer, or McNeil accessed Miron's background report on March 25.  [Dkt. 199-16, Exh. N, Report Access List].  The log demonstrates that a number of SPD employees accessed the report before this date, and that the

---

[5] Although Plaintiff contends that this document was printed to the printer in the SPD records room, which was the closest printer to McNeil's office, the evidence to which Plaintiff points does not demonstrate to which printer this document was sent.  [See Dkt. 203-5, Internal Affairs Investigation, McNeil Interview, p.213 (interview transcript page 24:4-7); Dkt. 203-3, Exh. 2, Printer Log p. 99].

report was last accessed on March 26, 2008: four times by Captain Popik and once by an employee named Freer.  [Dkt. 199-16, Exh. N, Report Access List].

The Plaintiff and Defendants have all presented evidence that the access times in the access log are pulled from the computer tower of the user who accesses a given background report and not from a network server.  [Dkt. 199-20, Exh. R, Meole Depo.  38:22 – 39:2; Dkt. 199-2, Ds' MSJ p.15; Dkt. 203, P's Opp. to Ds' MSJ, p. 8].  Plaintiff notes and the record reflects that Richard Hatcher, an Information Technology administrator employed by the Town of Stratford in 2008, testified that in March 2008 only a few of the Town's Information Technology employees had the ability to alter the time and date on the SPD's computer towers, a restriction that included the Chief of Police.  [Dkt. 203, P's Opp. to Ds' MSJ, p.8; Dkt. 199-23, Exh. U, Hatcher Depo.  23:3 – 25:6].  The access log indicates that only the three Defendants accessed Miron's background report on March 25.

After the release of Miron's background report, the SPD initiated an internal investigation of the incident.  During the investigation, the copy of Miron's background report printed by Defendant Soto was found in his office underneath the blotter on his desk.  [Dkt. 203, P's Opp. to Ds' MSJ, p.10; Dkt. 199-21, Exh. S, Buturla Depo. 38:20-25].  The investigation also found that Defendants McNeil and Farmer had violated various SPD policies, including Policy 7.14.  [Dkt. 203, P's Opp. to Ds' MSJ, p.10; Dkt. 203-3, Exh. 2, Internal Investigation findings, pp.36-45].

Criminal charges were also brought against the Defendants.  DNA analysis conducted on Defendants McNeil, Farmer, and Soto during the criminal investigation of the release of Miron's background report revealed that all three Defendants were "eliminated as contributors to the DNA profile" of a swabbing from the flap of the envelope containing the report sent to the Town Council.[6] [Dkt. 199-1, Ds' 56(a)(1) Stmnt. ¶18; Dkt. 203-1, P's 56(a)(2) Stmnt. ¶18; Dkt. 199-11, Exh. I, DNA and printer analysis].  A printer analysis conducted on the copies of the report sent to the Town Council as compared to a printout of Miron's background report "reportedly produced on a printer used by Joseph McNeil" concluded that "it cannot be determine [sic] if the device that produced the printing on Submission #009 [reportedly printed on printer used by McNeil] was used to produce the printing appearing on Submission #002, #003, #005 or #006 [copies sent to Town Council]."[7]  [Dkt. 199-1, Ds' 56(a)(1) Stmnt. ¶18; Dkt. 203-1, P's 56(a)(2) Stmnt. ¶18; Dkt. 199-11, Exh. I, DNA and printer analysis].

Although Defendants contend that the criminal charges brought against them were dismissed "based on the conclusive evidence of DNA analysis," this conclusion is not supported by the evidence to which Defendants cite.  [Dkt. 199-

---

[6] A buccal swab was obtained from each of the Defendants.  [Dkt. 199-11, Exh. I, DNA and printer analysis].  While the Defendants claim that this DNA evidence "proved that the three defendants were excluded as possible candidates responsible for distributing the plaintiff's background investigation to the Town Council," the evidence does not support this conclusion.  [Dkt. 199-1, Ds' 56(a)1 Stmnt. ¶18].

[7] While the Defendants claim that this printer evidence "proved that the three defendants were excluded as possible candidates responsible for distributing the plaintiff's background investigation to the Town Council," the evidence does not support this conclusion.  [Dkt. 199-1, Ds' 56(a)1 Stmnt. ¶18].

1, Ds' 56(a)1 Stmnt. ¶36].  As Plaintiff notes, Soto[8] and McNeil[9] both applied for accelerated rehabilitation, and Farmer pled guilty to a lesser charge of disorderly conduct in connection with the release of Miron's background investigation report to the Town Council.   [Dkt. 203-1, P's 56(a)2 Stmnt. ¶36; Dkt. 203-14, Exh. 11, Acc. Rehab. Apps.; Dkt. 203-13, Exh. 10, Farmer guilty plea transcript pp. 2, 6, 8, 9].

Finally, the Plaintiff and Defendants disagree on a number of issues presented in their 56 Statements, among them: whether and to what extent the Defendants had the authority to access background investigation reports; the amount of access that officers in general had to reports on the Hunt system; the credibility of the evidence as to the dates and/or times stamped on the closed circuit videos, the SPD's individual computer towers, and the incident reports printed from the Hunt computer system, whether a record of access is always created when incident reports are accessed, and whether more than one method of printing reports from the Hunt system existed.

IV.    Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of

---

[8] According to his Accelerated Rehabilitation application, Soto was charged with violations of Conn. Gen. Stat. §53a-254 (computer crime in the 3rd degree and conspiracy to commit computer crime).  [Dkt. 203-14, Exh. 11, Acc. Rehab. Apps.].
[9] According to his Accelerated Rehabilitation application, McNeil was charged with 3rd degree computer crimes and conspiracy pursuant to Conn. Gen. Stats. §§ 53a-254(a)(1), 53a-251(e)(1), and 53a-48.  [Dkt. 203-14, Exh. 11, Acc. Rehab. Apps.].

proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut,* No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record,

summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

## V.   Discussion

### a.   Federal Claims Pursuant to 42 U.S.C. § 1983

The Plaintiff brings two federal causes of action pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional right to privacy in his personal affairs and of his right to freedom of association.  The Defendants first argue that summary judgment of the federal claims is appropriate because the Plaintiff has failed to specify any unlawful acts taken under color of law.  Plaintiff counters that the Defendants are liable pursuant to § 1983 because they would not have been able to access or disseminate Plaintiff's background report but for their status as employees and police officers of the Town of Stratford.  Defendants further argue that Miron's federal privacy claim must fail because his background investigation report is a matter of public concern, and that his right to association claim is insufficient as a matter of law.

Any person who, under color of state law, deprives another person of his or her Constitutional rights is liable for injuries caused by the deprivation.  42 U.S.C. § 1983.  "To establish a constitutional violation under § 1983, a plaintiff must show that: (1) the defendants acted under color of state law; and (2) the defendants' actions resulted in a deprivation of plaintiff's constitutional rights." *Bhatia v. Yale Sch. of Med.*, 347 F. App'x 663, 664 (2d Cir. 2009).  The Plaintiff has failed to proffer sufficient evidence that the Defendants were acting under color

of law when they allegedly disseminated his background report, and has also failed to adduce sufficient evidence of either his constitutional right to privacy or freedom of association.

### b. Actions Under Color of Law

Because the U.S. Constitution regulates only the Government, not private parties, a plaintiff alleging a § 1983 violation "must show that the allegedly unconstitutional conduct is 'fairly attributable' to the state." *Cranley v. Nat'l Life Ins. Co. of Vermont*, 318 F.3d 105, 111 (2d Cir. 2003); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). "For the conduct of a private entity to be fairly attributable to the state, there must be such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Cranley*, 318 F.3d at 111 (internal quotation marks and citations omitted). It is "axiomatic that under 'color' of law means under 'pretense' of law and that acts of officers in the ambit of their personal pursuits are plainly excluded." *Pitchell v. Callan*, 13 F.3d 545, 547-48 (2d Cir. 1994) (internal quotation marks and citation omitted). "An official acts under color of state law for Section 1983 purposes when the official exercises a power possessed by virtue of state law and made possible only because the wrongdoer is cloaked with the authority of state law." *Zherka v. DiFiore*, 412 F. App'x 345, 347 (2d Cir. 2011); *Monsky v. Moraghan*, 127 F.3d 243, 245 (2d Cir. 1997) (substantially same). An off-duty police officer may act under color of law if his or her conduct "invokes the real or apparent power of the police department," or if he or she is performing "duties prescribed generally for police officers." *Pitchell*, 13 F.3d at

548.  The color of law requirement is also met if the official "gains access to the victim in the course of official duty" or if his "misuse of official power made the commission of a constitutional wrong possible, even though the official committed abusive acts for personal reasons far removed from the scope of official duties."  *U.S. v. Giordano*, 442 F.3d 30, 43, 44 (2d Cir. 2006).

"[W]hile it is clear that 'personal pursuits' of police officers do not give rise to section 1983 liability, there is no bright line test for distinguishing 'personal pursuits' from activities taken under color of law."  *Pitchell*, 13 F.3d at 548. Whether specific conduct constitutes state action is a "necessarily fact-bound inquiry."  *Cranley*, 318 F.3d at 112.  "In conducting this [inquiry], courts often look to the nature of the individual's act as well as the individual's official status." *Zherka*, 412 F. App'x at 347.  Courts in this Circuit have held that the ultimate resolution of whether a defendant acted under color of state law is a question of law for the court.  *Vega v. Fox*, 457 F. Supp. 2d 172, 181 (S.D.N.Y. 2006) (citing *Blum v. Yaretsky*, 457 U.S. 991, 997-98 (1982) (itself noting that "whether there is state action" is one of "several issues of law")); *Rodriguez v. Hynes*, 94-CV-4578, 1995 WL 350042, at *4 (E.D.N.Y. June 8, 1995) *aff'd sub nom. Rodriguez v. Weprin*, 116 F.3d 62 (2d Cir. 1997); *Rivoli v. Gannett Co., Inc.*, 327 F. Supp. 2d 233, 239 (W.D.N.Y. 2004) (collecting and citing 4th, 6th, 10th Cir. cases); *Folino v. Town of Niagara*, 07-CV-407, 2007 WL 4224635 (W.D.N.Y. Nov. 27, 2007); *VanBrocklen v. Gupta*, 09-CV-00897 A M, 2012 WL 7801682, at *3 (W.D.N.Y. Sept. 20, 2012) *report and recommendation adopted*, 09-CV-897, 2013 WL 1194727 (W.D.N.Y. Mar. 22, 2013).

The Court notes that Plaintiff's federal claims are based specifically on the Defendants' *dissemination* of his background report to the Town Council, rather than the Defendants' *access* to the report on the SPD's computer system.[10]  The record though is entirely devoid of any evidence demonstrating that the Defendants acted under color of law when they allegedly took the action of *disclosing* the report to the Council on or about March 27, 2008.  Instead, the record evidence sufficiently supports the contention that the Defendants *accessed* Miron's report on March 25, 2008 while they were on duty at the SPD, which precludes this court from finding that no genuine issue of material fact exists as to whether the Defendants then disseminated the report to the Town Council around two days later.

No evidence in the record speaks to the actions taken in disseminating Miron's background report.  There is no indication that the Town Council members to whom the report was released gained access to the report through any official channels.  No evidence in the record demonstrates that the Defendants used their authority as police officers to allow them access to the

---

[10] Plaintiff's Opposition to the Defendants' Motion for Summary Judgment contains a section specifically entitled "Defendants' Dissemination of Plaintiff's Confidential Background Report Deprived Plaintiff Of His Constitutionally Protected Right to Privacy in Violation of 42 U.S.C. 1983," which alleges that "Plaintiff has proffered evidence that Defendants *disseminated* materials relating to extremely private and sensitive aspects of his personal life …"  [Dkt. 203, P's Opp. to Ds' MSJ, p.15 (emphasis added)].  This section references the dissemination of Plaintiff's report throughout as the unlawful behavior that forms the basis of Plaintiff's privacy claim.  Plaintiff also bases his freedom of association claim on the dissemination of his background information rather than on the Defendants' access of it.  [See Dkt. 203, P's Opp. to Ds' MSJ, p.21.3 "Defendants' Dissemination of Plaintiff's Confidential Background Report Deprived Plaintiff Of His Constitutionally Protected Right to Freedom of Association …"; and throughout, pp. 21-23].

parties to whom the report was distributed, or that the Defendants were either on or off duty at the time they did so.  There is no evidence that the Defendants held themselves out as police officers while they were disseminating the report by wearing their police uniforms, identifying themselves as members of the SPD, or by otherwise distinguishing themselves from private citizens.  No affirmations, depositions, or other witness statements from Council members or others with personal knowledge shed any light on *how* this report was disseminated, or indeed *by whom or when*, nor could they as such witness statements do not appear in the record before the court.  Nor is there any indication that the envelope in which the cover letter and report were sent was either mailed from or bore the return address or seal of the Stratford Police Department.  The cover letter is written on plain paper instead of on police letterhead and purports to be authored by "The very disgusted residents of the Town of Stratford."  In short, there is nothing in the record upon which this court can base a conclusion that the Defendants acted under color of state law when they disseminated Miron's background report.

Moreover, assuming arguendo that one or more of the Defendants *did* disseminate Plaintiff's background report to the Council, and that they were off duty at the time, this case bears little resemblance to Circuit precedent under which off duty officers have acted under color of law by conveying the actual or implied authority of their positions to their victims in a manner out of line with their professional duties.  Here, there is no indication that the Defendants held themselves out as police officers in order to accomplish their goal of publicizing

Miron's background report, or that they threatened the weight of their authority to effect their ends.  *See, e.g.*, *Giordano*, 442 F.3d at 47 (mayor convicted of counts stemming from his sexual abuse of two minors acted under color of state law where he "actively and deliberately used his apparent authority as mayor to ensure that the victims did not resist or report the ongoing abuse"); *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (holding that off-duty police officer acted under color of law when he identified himself as a police officer and drew his gun on a motorist with whom he had an argument over the use of a roadside payphone); *Hayut v. State Univ. of New York*, 352 F.3d 733 (2d Cir. 2003) (state university professor acted under color of state law in sexually harassing student in light of professor's power and authority over student); *Rivera v. La Porte*, 896 F.2d 691, 695–96 (2d Cir. 1990) (holding that off duty corrections officer acted under color of law when he arrested and assaulted driver following private argument during traffic jam); *Rosenberg v. City of New York*, 09-CV-4016 CBA LB, 2011 WL 4592803, at *7 (E.D.N.Y. Sept. 30, 2011) (in the context of harassment among public co-workers, "where the harassment in question does not involve use of state authority or position, the harasser is generally found not to be acting under color of state law.").

Proof of action under color of state law is an essential element of a claim brought under 42 U.S.C. § 1983.  Plaintiff has failed to present evidence that the Defendants disseminated his background report under color of state law, and thus has failed to prove a necessary element of his federal claims.  In sum, no evidence in the record exists such that this court could conclude that the

Defendants' alleged dissemination of Plaintiff's background report was anything other than the private appropriation of a public record.  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'"  *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

However, Plaintiff has pleaded and argued that the Defendants' *accessing* of Miron's report constituted action under color of state law, and the court agrees. Here, Miron authorized the disclosure of his personal information to the SPD solely for its evaluation of his suitability to serve as a Stratford police officer and not for purposes of public dissemination.  There is no evidence that any Defendant accessed Miron's background report in furtherance of his official duty to evaluate Miron's suitability as a candidate for employment.  Further, the Defendants were only able to access Miron's background investigation report because of their official positions as SPD police officers, as non-employees of the SPD did not have access to the Hunt computer system.  Therefore, to the extent that the Defendants were responsible for its dissemination, the Defendants acted under color of state law for Section 1983 purposes because they were only able to access Miron's background investigation report through abuse of their official power.  This conclusion, though, is not dispositive as it is but one of two prongs in the § 1983 analysis for which a genuine issue of material fact must be evident,

and Miron's federal constitutional claims fail under the second prong of this analysis.

     **c.**  <u>Deprivation of Constitutional Rights</u>

Even if the Plaintiff has satisfied his burden of proving that the Defendants acted under color of state law in disseminating his background information, to establish a constitutional violation under § 1983, Miron must also demonstrate that the Defendants' actions resulted in a deprivation of his constitutional rights, namely his right to privacy and his right to freedom of association.  *See Bhatia*, 347 F. App'x at 664.  Miron has not met this burden.

     **i.**  <u>Right to Privacy</u>

The Defendants urge the court to grant summary judgment in their favor because the Plaintiff has failed to proffer sufficient evidence that the Defendants acted with callous indifference and because the information in Plaintiff's background investigation report is a matter of public concern.  Plaintiff counters that the Defendants did not have the unilateral right to release his background report without first affording him notice or an opportunity to object to the release, and also that the release of this report violated his constitutional right to privacy because the report contains "extremely private and sensitive aspects of his personal life, including financial history, familial history, academic history, medical history, information related to a psychological evaluation, as well as questions directed toward past drug use and sexual encounters."  [Dkt. 203, P's Opp. to MSJ, p.16].

"**In two cases decided more than 30 years ago, [the Supreme] Court referred broadly to a constitutional privacy 'interest in avoiding disclosure of personal matters.'**"  *NASA v. Nelson*, 131 S. Ct. 746, 751 (2011) (quoting *Whalen v. Roe*, 429 U.S. 589, 599 (1977) and *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 457 (1977)).[11]  **The Second Circuit has since recognized the existence of such a right, which more precisely "can be characterized as a right to 'confidentiality,' to distinguish it from the right to autonomy and independence in decision-making for personal matters" also recognized in Supreme Court precedent.**  *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994); *see also Matson v. Bd. of Educ. of City Sch. Dist. Of New York*, 631 F.3d 57, 63-64 (2d Cir. 2011) ("**As a general matter, there exists in the United States Constitution a right to privacy protecting the individual interest in avoiding disclosure of personal matters.**") **(internal quotation marks omitted).  The right to privacy remains "one of the less delineated constitutional guarantees."**  *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999).  **Potential violations of this right to privacy in personal information and matters have been analyzed as violations of the Fourteenth Amendment.**  *See Men of Color Helping All Soc., Inc. v. City of Buffalo*, 12-3067-CV, 2013 WL 3285208 (2d Cir. July 1, 2013); *Palkimas v. Bella*, 510 F. App'x 64 (2d Cir. 2013) **(characterizing right as "Due Process right to privacy");** *Sealed Plaintiff No. 1 v. Farber*, 212 F. App'x 42 (2d Cir. 2007).

---

[11] **The Supreme Court has recently declined to conclusively confirm the existence of a constitutional right to privacy in personal matters.  In** *N.A.S.A.*, **the Court "assume[d], without deciding, that the Constitution protects a privacy right of the sort mentioned in** *Whalen* **and** *Nixon*."  *N.A.S.A. v. Nelson*, 131 S. Ct. at 751.

Two distinct standards exist in the Second Circuit for analysis of alleged breaches of the right to confidentiality.  "When legislation burdens constitutionally protected privacy rights, we will apply intermediate scrutiny and uphold the statute only if a substantial government interest outweighs the burdened privacy right."  *O'Connor v. Pierson*, 426 F.3d 187, 202-03 (2d Cir. 2005).  *See also Statharos*, 198 F.3d at 323 (applying intermediate scrutiny to financial disclosure law); *Bertoldi v. Wachtler*, 952 F.2d 656 (2d Cir. 1991) (same); *Barry v. City of New York*, 712 F.2d 1554, 1559 (2d Cir. 1983), *cert. denied*, 464 U.S. 1017 (1983) (same).  "Whether a state actor violated a plaintiff's constitutional right to privacy always entails a balancing of the individual's right to keep personal information private and the government's sufficient interest in disclosing or disseminating that information.  That is, any right to preclude its disclosure is not automatic and has to be balanced against the government's justification for disclosure or dissemination in order to determine whether the right to privacy is violated."  *Palkimas*, 510 F. App'x at 66.  Thus, "[u]nder intermediate scrutiny, if [a law or regulation] is 'designed to further a substantial governmental interest and does not land very wide of any reasonable mark in making its classifications,' it must be upheld."  *Statharos*, 198 F.3d at 324.

However, "[t]o prevail when challenging executive action that infringes a protected right, a plaintiff must show not just that the action was literally arbitrary, but that it was 'arbitrary in the constitutional sense,' … Mere irrationality is not enough: 'only the most egregious official conduct,' conduct that 'shocks the conscience,' will subject the government to liability for a substantive due

process violation based on executive action." *O'Connor*, 426 F.3d at 203 (internal citations omitted). *See also Farber*, 212 F. App'x at 43 ("A violation of the Fourteenth Amendment's due process clause in the context [of a violation of privacy in regard to personal matters] requires that [the defendant]'s conduct 'shock the conscience.'"). Intentional actions or those taken with "deliberate indifference" may give rise to a constitutional violation. *Farber*, 212 F. App'x at 43.

The Second Circuit has recognized a constitutional right to privacy in personal matters or information in very limited circumstances. Constitutional protection exists in this Circuit for information regarding the state of one's health, but within "narrow parameters." *Matson*, 631 F.3d at 65. The extent of the privacy right varies with the nature of the medical condition; "[c]onfidential medical conditions are those that are 'excruciatingly private and intimate in nature' such as those 'likely to provoke ... an intense desire to preserve one's medical confidentiality.'" *Id.* at 64 (citing *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999)). Such a privacy right exists in the Second Circuit, for instance, with regard to a person's HIV status or transsexualism, but not with regard to a diagnosis of fibromyalgia. *Matson*, 631 F.3d at 64, 67 ("although fibromyalgia is a serious medical condition, it does not carry with it the sort of opprobrium that confers upon those who suffer from it a constitutional right of privacy as to that medical condition."); *Powell*, 175 F.3d 107 (transsexualism entitled to privacy protection); *Doe v. City of New York*, 15 F.3d 264 (2d Cir. 1994) (HIV status entitled to privacy protection). The Second Circuit has also recognized that "a person's status as a

juvenile sex abuse victim is clearly the type of 'highly personal' information that we have long recognized as protected by the Constitution from governmental dissemination absent a substantial government interest in disclosure." *Farber*, 212 F. App'x at 43.

The right to privacy in personal matters has often been analyzed in the context of laws and regulations that require the disclosure of personal financial information to the government. *See Barry*, 712 F.2d 1554; *Eisenbud v. Suffolk County*, 841 F.2d 42 (2d Cir. 1988); *Bertoldi*, 952 F.2d 656; *Statharos*, 198 F.3d 317. The Second Circuit has routinely upheld regulations that require financial disclosures of both public employees and private employees regulated by the government on the grounds that the public interest in a transparent government that takes steps to deter corruption and conflicts of interest outweighs an individual's right to absolute privacy of financial information. The Second Circuit has stated that "[w]e do not think that the right to privacy protects public employees from the release of financial information that is related to their employment or indicative of a possible conflict of interest. Nor do we think the release of information that is not 'highly personal' rises to the level of a constitutional violation." *Barry*, 712 F.2d at 1562. Where a financial disclosure statute's purpose is to "deter corruption and conflicts of interest among [municipal] officers and employees, and to enhance public confidence in the integrity of its government," such a statute furthers a "substantial, possibly even a compelling, state interest." *Id.* at 1560. Such laws "derive considerable strength from the benefits widely felt to be derived from openness and from an

informed public," as there is a "compelling state interest in the maintenance of an honest civil service … and [ ] an informed public is essential to the nation's success, and a fundamental objective of the *first amendment*."  *Id.* at 1560 (citations omitted).  *See also Bertoldi*, 952 F.2d at 660 ("It is the interest in reducing the risk of corruption and conflict of interest in the discharge of important public and quasi-public responsibilities in order to enhance public confidence in the integrity of government. We have repeatedly recognized that this is the state interest advanced by financial disclosure laws and have also recognized the substantiality of that interest.").  In examining such disclosure laws, courts must examine "whether the duties of the categories of employees subject to such requirements were of sufficient public responsibility and sensitivity so that disclosure furthers the substantial state interest of lessening the apprehended risks of corruption or conflict of interest."  *Id.* at 660.

The Second Circuit has additionally noted that financial disclosure laws that contain provisions protecting against the public disclosure of particularly sensitive information – such as provisions that allow an individual to plead a compelling privacy interest in certain information such that limited disclosure to the public is warranted – comply with constitutional privacy restrictions.  *Barry*, 712 F.2d at 1561, 1563 (privacy claim procedures "strengthened" financial disclosure statute's constitutionality, but "in any event, … the City's interest in public disclosure outweighs the possible infringement" of privacy rights).

First, Miron's argument that his privacy rights were infringed because the Defendants did not afford him an opportunity to or a mechanism by which he

could object to the public release of his information is inapposite as the dissemination of Miron's background report to the public did not occur pursuant to a law or regulation requiring disclosure of this information to a government entity, but rather was allegedly the result of rogue actions by municipal employees.  Thus, the court's analysis is subject to the "shocks the conscious" test employed when information is disclosed by individual government entities and a plaintiff does not seek to challenge a regulation or law requiring disclosure.

Second, Miron's broad argument that the Defendants violated his constitutional privacy interests by releasing his background report in its entirety must fail as (1) Miron has not proffered sufficient evidence that the majority of the information contained in the report is so personal or intimate that it would be entitled to constitutional protection, and (2) even if portions of the report are constitutionally protectable, Miron cannot overcome the public interest involved in the content of his background report as a whole or in the specific information revealed.  As well as relating to the Fourteenth Amendment's amorphous protection of personal information, this case also implicates the Defendants' rights to First Amendment freedom of speech.  These two interests must be balanced.  "The mere fact of government employment does not result in the evisceration of an employee's First Amendment rights. . . . [F]ew values are more carefully and thoroughly protected than the citizen's right to speak his mind on matters of public concern without interference by the government." *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003) (citations omitted).  "Speech by a public employee is on a matter of public concern if it relates 'to any matter of political,

social, or other concern to the community.'"  *Id.* at 112 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)).  "Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record."  *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir. 1999).[12]

Here, Mr. Miron applied to become a police officer in the town in which his brother served as Mayor.  He received a verbal offer of employment with the SPD in March, 2008 and received a letter confirming his offer of employment on April 18, 2008.  His background investigation report was released to the Town Council on or about March 27, 2008.  The cover letter that was sent to the Town Council along with Miron's background report – which both the Plaintiff and the Defendants reference in their briefs and their 56(a) statements – charges the Stratford Police Department and Mayor Miron's administration with "corruption" and further accuses the SPD of imminently employing Christian Miron on the basis of nepotism and in contradiction of various red flags in his background investigation report.  [Dkt. 199-10, Exh. H, Cover Letter to Council].  The letter charges that the "amount of negative aspects" of Miron's background investigation would have disqualified any other applicant from employment as an officer, and notes concern that Miron's disclosed 5% neck disability may lead to future disability pension payouts.  It also expresses concern that Miron's use of marijuana within two years of his application and his receipt of numerous recent traffic tickets would affect his ability to act safely as an officer entrusted with a

---

[12] The referenced cases occurred in the context of government employee claims of First Amendment retaliation for speech purported to be of public concern.

weapon and a vehicle.  The letter further noted as cause for concern Miron's polygraph results, which demonstrated a "physiological reaction" to driving after drinking and to physical condition questions which the report noted could warrant further background investigation.  Further, the background report itself contains a summary of the fairly negative results of Miron's psychological evaluation, in which the mental health professional who performed the evaluation recommended Miron for employment, but "with strong reservations for a police officer position."  [Dkt. 210, Exh. K, Incident Report 08-3321 (sealed)].

Hiring officers with admitted permanent disabilities and turning a blind eye to recent and frequent driving infractions by applicants for positions which require them to drive public police vehicles are issues that implicate public safety.  Municipal government practices or customs which facilitate such hiring implicate the trust the public places in its municipal government and in its peace officers.  As such, the concerns raised in the cover letter, including those of corruption and its effects on the SPD's ability to hire competent officers who would not pose a risk to public safety, are quintessentially matters of public concern in line with case law in this Circuit, especially where the department charged with protecting the public is the agency charged with violating this mandate by way of improper hiring practices.  *See, e.g., Ganim*, 342 F.3d at 112 ("discussion regarding current government policies and activities is perhaps the paradigmatic matter of public concern.") (citation omitted); *Griffin v. City of New York*, 880 F. Supp. 2d 384, 401 (E.D.N.Y. 2012) ("Speech relating to the functioning of government is of particularly great import to the public."); *Anemone v. Metro.*

**34**

*Transp. Auth.*, 410 F. Supp. 2d 255, 265 (S.D.N.Y. 2006) ("Speech relating to public corruption and/or a public entity's failure to adequately or properly investigate such corruption lies comfortably within these categories of protected expression."); *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) *cert. denied*, 132 S. Ct. 1634, 182 L. Ed. 2d 233 (2012) ("Exposure of official misconduct, especially within the police department, is generally of great consequence to the public;" holding that speech on police malfeasance consisting of the use of excessive force is a matter of public concern) (quoting *Branton v. City of Dallas*, 272 F.3d 730, 740 (5th Cir. 2001)).

This court must therefore weigh the public interest in disclosure of such matters of public concern against the need for continued confidentiality of Miron's personal information as contained in his background investigation report. The court starts with the broad categories of information present in the background report that *could* merit constitutional protections in certain circumstances: personal financial information and information about the state of one's health.  Here, none of the information that falls into these two categories rises to the levels necessary under current Circuit precedent to warrant constitutional protection.  As noted previously, the Second Circuit protects information regarding the state of one's health, but only for medical conditions that are "excruciatingly private and intimate in nature such as those likely to provoke ... an intense desire to preserve one's medical confidentiality," such as HIV and transsexualism.  *Matson*, 631 F.3d at 64 (citation omitted).  Here, although Miron claims that his medical information is entitled to constitutional protection,

his background report contains information relating only to a 5% permanent disability in his neck as a result of a car accident and of a pulled muscle in his leg that healed during the time his application to the SPD was pending.  Neither of these conditions is sufficiently serious to warrant constitutional protection.

Miron also claims that Defendants should be constitutionally liable for the disclosure of information related to the psychological evaluation he underwent to determine his suitability for employment with the SPD.  While the Supreme Court has long recognized the need for confidentiality in psychological treatment, *see Jaffee v. Redmond*, 518 U.S. 1, 10 (1996) (recognizing a federal privilege protecting confidential communication between a patient and a licensed psychotherapist or social worker), the psychological information contained in Miron's background report is easily distinguishable.  While the psychotherapist-patient privilege "serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem," *id.* at 11, a psychological evaluation performed solely for the purposes of determining suitability for employment contains no such implication of treatment and does not presuppose a relationship between the therapist and the candidate for public employment.  Indeed, the results of Miron's psychological evaluation in the background report concern only the professional's assessment of Miron's suitability to perform police work, an assessment in which the public has a concern.  As the Second Circuit has recently noted, "[l]ay people are not qualified to determine other people's medical fitness, whether physical or mental; that is what independent medical experts are

for." *O'Connor*, 426 F.3d at 202.  The lay public, then, which may not determine mental fitness for duty, have an interest in the ultimate conclusion a psychologist or mental health professional may make as to a candidate's fitness to perform sensitive police work on the public payroll.  No mental diagnosis is implicated in Miron's background report, nor is any past or ongoing psychological treatment implied or recommended.  The psychological evaluation merely lists the psychologist's assessment of whether Miron is a suitable candidate for police work.  The public interest in assuring that candidates who have been offered employment with the police department have indeed passed the psychological evaluations to which they are subjected is not overcome by a candidate's privacy interest in keeping the results of such an evaluation secret where, as here, the professional expresses reservations about a candidate's suitability for the job.

Likewise, the information in Miron's background report relating to his financial history – namely his credit score and information regarding small delinquent accounts in collection – is not sufficiently intimate or particularized to overcome the public's entitlement to be informed about potential conflicts of interest or the potential for corruption among police officers.  As the Second Circuit has often made clear in the context of financial disclosure requirements, the public has an interest in the release of financial information that is related to a public employee's employment or indicative of a possible conflict of interest.  *See Barry*, 712 F.2d at 1562.  Information revealing that a police officer owes financial debts may be relevant to whether an officer will be tempted to wield his authority in an improper manner, leading to a lack of public trust in law enforcement and/or

municipal government.  As such, disclosure of the financial problems of a police officer candidate who has received an offer of employment falls squarely within the category of information whose "disclosure furthers the substantial state interest of lessening the apprehended risks of corruption or conflict of interest." *Bertoldi*, 952 F.2d at 660.

Miron also claims a violation of his constitutional right to privacy in the disclosure of his responses to questions about his past drug use and public sexual encounters.  Miron, though, has proffered no argument as to why these two categories of responses are protectable aside from his conclusory allegation that they are private matters.  Neither, though, is salacious or scandalous enough to prompt the type of privacy protection Miron posits.  Miron's disclosure of a youthful indiscretion in an automobile (comprising two lines of the nine page background investigation report), *may* merit the title of salacious, but such acts are commonly depicted in modern culture and have become commonplace in the public psyche -- hardly the type of highly intimate or stigmatizing personal information that merits constitutional protection.  Further, the sexual conduct information in the report is scant; this court would be hard-pressed to conclude that, with nine pages of background information to ponder (most of which consists of positive employer and reference reviews), two lines of non-descriptive information would merit a reaction larger than a mere ripple.

Moreover, Miron's disclosure about his past marijuana use within two years of his application to become a Stratford Police Officer, as noted previously, is of public concern not outweighed by Miron's interest in maintaining the privacy of

this admission.  Nor is it particularly derogatory given current mores as reflected in the decriminalization of marijuana in the quantities Miron admitted to having used.

Similarly, the review and release of Miron's academic information as a part of his background investigation report is relevant to the public's informed review of police officer candidates and may speak to Miron's suitability for the position for which he applied.  Although the academic information in Miron's report is largely unflattering, it is not universally so.  Academic history is a routine screening tool for both public and private employment.  The simple release of Miron's academic information, then, is unlikely to cause irreparable harm in any area in which it would *not already have been considered*.  In other words, because employers largely request academic records to determine eligibility for employment, the public release of this information would not divulge anything to a prospective employer that the employer would not be entitled to independently request of a candidate.  Where the Second Circuit has not afforded wide constitutional protection to academic information, this court declines to expand the understanding of the right to privacy in personal information.

Furthermore, although Miron claims that disclosure of his "familial history" violates his right to confidentiality, this information is a matter of public record. "[T]here is no question that an individual cannot expect to have a constitutionally protected privacy interest in matters of public record." *Doe v. City of New York*, 15 F.3d 264, 268 (2d Cir. 1994).  As far as this court can discern, the only familial history information in Miron's background report relates to the potentially

**39**

criminal activities of two of Miron's family members.  The background report explicitly notes that the activities of one family member led to her arrest, which was publicized in the media.  Additionally, the court takes judicial notice of the fact that Miron's father, the second family member featured in his background investigation, was sued by the State Attorney General and the Department of Consumer Protection in connection with unlawful activities relating to his business shortly after Miron's background report was released.  *See State of Connecticut v. Lakeview Monument Co., et al*, HHD-CV08-4036659-S, *available at* http://civilinquiry.jud.ct.gov/GetDocket.aspx.  The Office of the Attorney General published a press release dated April 8, 2008 describing the suit.  *See* http://www.ct.gov/ag/cwp/view.asp?Q=412822&A=2795, "Press Release: Attorney General, DCP Sue Defunct Bridgeport Headstone Company For Failure To Provide Monuments."  Miron's background report references the investigation of his father that eventually led to the suit.  Such public information is not constitutionally actionable.

Given the narrow scope of the right to privacy of one's personal information in the Second Circuit, and given that none of the information revealed in Miron's report rises to the level of intimacy of those realms of public information protected in this Circuit, this court declines to create new constitutional privacy protections to encompass Miron's academic or social history.  Nor does Miron's financial or medical information meet the threshold for constitutional protection within this Circuit.  Put succinctly, public disclosure of the personal information in Miron's background report, although potentially

embarrassing to Mr. Miron, is not entitled to the very narrow constitutional protection afforded by the 14th Amendment's right to privacy where the information is of relevance to the public's knowledge and review of the credentials of those candidates for hire into positions of trust and authority on the police force.  Moreover, as public information, the familial information in Miron's report is not protectable as a matter of law.

Consequently, the scales do not tip in Plaintiff's favor.  The release of Mr. Miron's background report or the specific information contained therein does not rise to the level of a constitutional deprivation of the right to privacy where he received an offer of employment despite valid public concerns as to his suitability to become a police officer as contained in the background report.  That is not to say that the release of another candidate's report – a candidate, for instance, whose application does not raise the red flags that Miron's report generated, or whose report raises such issues and results in the candidate's non-hire – would not be a constitutional violation.  To the contrary, it is probable that the release of a background report containing, for instance, negative financial or psychological evaluation information of a candidate who was *not* offered a position on the force would merit constitutional protection and would not be abrogated by any public interest in the content of the report.  Indeed, absent an offer of employment to Mr. Miron, it is unlikely that the Defendants would prevail on an argument that the public had an interest in knowing the contents of his background report.  Those particular circumstances do not present themselves here.  Instead, the crux of this case is that the Plaintiff – the brother of the Mayor of the town in which he

41

applied to become a public police officer – received an offer of employment from the SPD despite the inclusion in his background report of information that bore negatively on his suitability to become a police officer.  In sum, as Miron's background report is not so personal as to overcome the public's concern in its contents, its release to the public does not "shock the conscience."  *O'Connor*, 426 F.3d at 203; *Farber*, 212 F. App'x at 43.

Miron has thus not established a violation of his right to privacy under the Fourteenth Amendment.

### ii.  Freedom of Association

Counts 5, 6, and 7 allege that Defendants, in their individual capacities, undertook "an intentional effort to deprive Plaintiff of his freedom of familial association" with his brother, James Miron, in contravention of the First Amendment and pursuant to 42 U.S.C. § 1983, which irrevocably harmed his employment opportunities with the SPD.  [Dkt. 176, 3rd Am. Compl. ¶¶89, 90, 97, 98, 105, 106].  As with Plaintiff's privacy claim, in order to make out a violation of 42 U.S.C. § 1983, Miron must demonstrate the deprivation of his constitutional right to freedom of association by way of state action.  The Defendants argue that Plaintiff's claim must fail because he has failed to allege any facts supporting his right to association claim, has failed to denote how the Defendants' actions have interfered with this relationship with his brother, James Miron, and has not demonstrated that he was not hired by the SPD as a result of his familial relationship with his brother.  The Plaintiff counters that he has proffered

sufficient evidence of the existence of a protected relationship.  He also contends that, "[a]s a result of the Defendants' disagreement with the actions of Mayor James Miron, Defendants violated Plaintiff's constitutional rights for the purpose of personal and political gain, as well as to punish Plaintiff for the fact that his brother was the Mayor of Stratford," as plainly evidenced by the cover letter sent to the Council, which Plaintiff characterizes as a personal attack that occurred solely due to the Miron brothers' sibling relationship.  The court concludes that even where Plaintiff has successfully alleged state action pursuant to § 1983, he has failed to allege a deprivation of his right to intimate association.

A constitutionally protected freedom of association exists in two distinct contexts: (1) a right to enter into and maintain certain intimate relationships and (2) a right to associate with others for purposes of engaging in activities traditionally protected by the First Amendment, such as speech, assembly, the exercise of religion, and other expressive conduct.  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984); *Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999).  In recognizing this right, the Supreme Court emphasized that protection of certain relationships is tantamount: "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme."  *Roberts*, 468 U.S. 609, 617-18.

"[T]he source of the intimate association right has not been authoritatively determined," although it may lie under the First and Fourteenth Amendments, depending on the context.  *Adler*, 185 F.3d at 42, 43; *see also Patel v. Searles*, 305

F.3d 130, 133 (2d Cir. 2002) ("Although clearly recognized in a general way by the Supreme Court and in scholarly writings, all of its boundaries have not yet been fixed").  Where the government seeks to regulate an individual's right to decide whom to marry, for instance, such regulation "clearly require[s] assessment under the substantive due process component of the Fourteenth Amendment." *Id.* at 44.  The Second Circuit has also recognized the varied standards used to determine whether this right has been violated:

> Sometimes court opinions suggest that an intimate association right is not violated unless the challenged action has the likely effect of ending the protected relationship, … or unless affecting the relationship was the purpose of the challenged regulation, .... In other cases, the opinions consider whether the challenged action alleged to burden an intimate association is arbitrary or an 'undue intrusion' by the state into the marriage relationship.

*Adler*, 185 F.3d at 43-44.

Nonetheless, the Second Circuit has concluded that though the matter is not free from doubt, "a spouse's claim that adverse action was taken solely against that spouse in retaliation for conduct of the other spouse should be analyzed as a claimed violation of a First Amendment right of intimate association."  *Id.* at 44 (holding that claim that husband was terminated from public employment in retaliation for wife's lawsuit alleging employment discrimination was rightly brought under First Amendment as an intimate association claim).  *See also Agostino v. Simpson*, 08-CV-5760 (CS), 2008 WL 4906140 (S.D.N.Y. Nov. 17, 2008) ("Where a plaintiff is allegedly retaliated against for the First Amendment activities of a family member and asserts a claim based

on intimate association, the courts in this Circuit have considered the claim as deriving from the First Amendment."); *Talley v. Brentwood Union Free Sch. Dist.*, 08 CV 790 DRH ETB, 2012 WL 3841396 (E.D.N.Y. Sept. 5, 2012) (First Amendment analysis applies to daughter's claim that she was not hired for teaching position because of animus toward father's conduct as school board member); *Jenkins v. Tyler*, 167 F. Supp. 2d 652, 653 (S.D.N.Y. 2001) (son's termination so as to avoid appearance of impropriety because of mother's position as member of board of directors warranted analysis under First Amendment); *Sutton v. Vill. of Valley Stream, N.Y.*, 96 F. Supp. 2d 189 (E.D.N.Y. 2000) ("Where, however, there is a claim that the exercise of one spouse's First Amendment right harms a right of intimate association, that right was held to be properly analyzed as the deprivation of a right under the First Amendment," which encompasses father-son relationship); *Rajaravivarma v. Bd. of Trustees for Connecticut State Univ. Sys.*, 862 F. Supp. 2d 127, 168 (D. Conn. 2012) (VLB) (employing the *Adler* standard and analyzing under First Amend. claim that husband suffered retaliation for lawsuit brought by his wife against the state).  "Where the intimate association right at issue is tied to familial relationships and is independent of First Amendment retaliation concerns, however," an analysis under the framework of the Fourteenth Amendment right to substantive due process is proper.  *Garten v. Hochman*, 08 CIV. 9425 (PGG), 2010 WL 2465479, at *4 (S.D.N.Y. June 16, 2010).

        Neither of the parties dispute that Plaintiff's intimate association claim is properly analyzed under the First Amendment and both parties cite the Second Circuit's decision in *Adler* and its progeny in support of their positions.  Nor do

the parties dispute that Christian Miron's relationship with his brother warrants protection under the First Amendment.  Although this element is undisputed, the Court notes that the Supreme Court has recognized that associations warrant varying degrees of protection, with close family relationships involving "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life," evincing the strongest need for protection.  *Roberts*, 468 U.S. at 619-20.  To determine whether certain familial relationships warrant protection, a court must "assess such factors as cohabitation and the precise degree of kinship."  *Patel*, 305 F.3d at 136.  The sibling relationship is one recognized as warranting protection.  *See, e.g., Patel*, 305 F.3d at 136 ("the relationships at issue in this case—those between [plaintiff] and his father, siblings, wife, and children—receive the greatest degree of protection because they are among the most intimate of relationships"); *Berrios v. State Univ. of New York at Stony Brook*, 518 F. Supp. 2d 409, 418 (E.D.N.Y. 2007) ("the right of intimate association encompasses the husband/wife relationship … as well as the familial relationships between parents, siblings and children").  Non-familial relationships, for the most part, do not fall within this First Amendment protection.  *See Berrios*, 518 F. Supp. 2d at 421 (alleged unfair treatment and retaliation in the terms of research assistant's employment based upon close working relationship with research professor did not implicate First Amendment right to freedom of association, as relationship was not one within category of protected intimate relationships).

Here, Plaintiff contends that he suffered a loss of employment opportunities with the Stratford Police Department as a result of Defendants' release of his background report to the Town Council, which in turn was prompted solely by Plaintiff's relation to the Mayor of the Town of Stratford.  This claim, though, must fail as Plaintiff has not proffered sufficient evidence that his loss of opportunity resulted from his relationship with his brother and not from his own unsuitability for the job for which he applied.  Plaintiff points to the cover letter received by the Town Council as proof that his sibling relationship was the reason for the dissemination of his background report.  The cover letter though, while tying Miron's application to the SPD with his brother's influence over the hiring process, nonetheless indicts the Plaintiff primarily for the negative aspects of *his own* application for a police officer position (namely his poor driving record, marijuana use, and partial neck disability), which the letter writer or writers perceived as indicative that Miron was not qualified to become a police officer and would potentially pose a threat to public safety.  The crux of the cover letter is that Christian Miron received or was about to receive a *positive* benefit – employment with the SPD – that he would *not* have received absent special treatment because of his familial relationship with the Mayor.  Plaintiff's relationship with his brother, then, was not the driving force behind his loss of employment opportunity; rather, the deficiencies in Miron's application led to his loss of employment opportunities after these deficiencies were made public, and his relationship allegedly provided an employment benefit that otherwise would not have been available to him.  According to the cover letter, Miron's relationship

afforded him an opportunity for which he was not qualified because of his unsuitability for the position.  Miron cites no evidence that other applicants with backgrounds comparable to his were hired by the SPD.  In short, there is no evidence to suggest that the actions taken against the Plaintiff were in retaliation for animus towards Miron's brother, but rather the release of Plaintiff's background report stemmed from the weakness of his own application for public employment.

Indeed, the cover letter is the only admissible evidence to which Plaintiff cites for the proposition that his intimate associational rights were violated. Although Plaintiff claims that the Defendants violated this right "for the purpose of personal and political gain," Miron has cited to no evidence in the record – and the court is aware of none – to support his proposition.  [Dkt. 203, P's Opp. to Ds' MSJ, p. 22].  He has failed to name in even the broadest terms the alleged personal or political gain the Defendants sought.  Plaintiff also asserts that Shawn Farmer had an "exceedingly hostile and unprofessional relationship" with Mayor James Miron and that the two were political opponents but has cited to no admissible evidence to support this proposition.  [Dkt. 203, P's Opp. to Ds' MSJ, p. 23; Dkt. 203-1, P's 56(a)2 Stmnt. Disputed Fact ¶¶14, 15].  Instead, he references the deposition testimony of Captain Popik and of Deputy Chief LoSchiavo, who noted without discussing any specific instances or details merely that they perceived Farmer to have "butted heads with" Mayor Miron or had "been an outspoken person against [Miron's] administration."  [Dkt. 199-19 Exh. Q, Popik Depo. 105:18; Dkt. 203-9, Exh. 6, LoSchiavo Depo. 343:1-3].  This testimony, aside

48

from being far too general to provide credible support for Plaintiff's assertions, and aside from its lack of any concrete instances from which the two deponents could have perceived Farmer's relationship with Miron, is inadmissible hearsay. Plaintiff last cites to a media article published on May 1, 2008 that he contends reported that "Farmer was leading a no confidence vote for Mayor James Miron." [Dkt. 203, P's Opp. to Ds' MSJ, p. 23; Dkt. 203-1, P's 56(a)2 Stmnt. Disputed Fact ¶ 15]. The article, however, says no such thing. Rather, the article reports low morale within the SPD as reported by Union president Farmer "over alleged violations of the union contract *by Chief John Buturla and Deputy Chief Joseph LoSchiavo.*" [Dkt. 203-3, Exh. 2., News Article 5/1/08, p.60 (emphasis added)]. The article further cites Farmer as reporting that there was growing support for a vote of no confidence "in the *department leadership*" based partially on "an inconsistent hiring process that 'bends and changes the rules' for some candidates – such as Christian Miron, the brother of Mayor James R. Miron." [*Id.* (emphasis added)]. This article – published more than one month after the release of Plaintiff's background report – notes displeasure with the SPD's leadership, namely Chief Buturla and Deputy Chief LoSchiavo, and growing support for a union vote of no confidence in *their* leadership.

Moreover, even if this article supported Plaintiff's assertions as to Farmer's relationship with Mayor Miron, it would cut against Plaintiff's constitutional argument. Any actions taken by Farmer in his capacity as union president (for instance, in leading a no confidence vote as noted by the article Plaintiff cites or in disseminating Plaintiff's background report for reasons attributable to his

union involvement) are not taken under color of law.  *See Cahill v. O'Donnell*, 75 F. Supp. 2d 264, 278 (S.D.N.Y. 1999) (actions performed in union capacity were not actions performed for the government, but solely for benefit of union); *Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996) (same).  Actions taken in this capacity may not support a constitutional tort claim under 42 U.S.C. § 1983.  The court notes that in his opposition to the Defendants' motion for summary judgment, the Plaintiff has specifically alleged that "[t]he Union, particularly its President, Defendant Farmer, was opposed to Mayor James Miron's actions regarding the SPD, including, but not limited to, his choice for Chief of Police." [Dkt. 203, P's Opp. to Ds' MSJ, p.3].  While this assertion is unsupported by any admissible evidence to which the Plaintiff cites, it also seems to assert that Defendant Farmer's alleged involvement in the disclosure of Miron's background information was in furtherance of his position as President of the Union and not of his position as an officer.

As to Defendants McNeil and Soto, Miron has failed to present any evidence that they released his background report to the Town Council because of his relationship with his brother.  Miron has also presented no evidence in the record that any of the three Defendants were involved in the decision not to place Miron in the police academy.  As stated previously, "a defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'"  *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir.

2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Plaintiff has not met this burden.

Importantly, Soto and McNeil recommended Miron for hire into the SPD on February 5, 2008 by way of their participation in the Chief's oral interview panel of Christian Miron.  There is no evidence in the record that Soto and McNeil were unaware at this point that Miron was the mayor's brother, nor is there any evidence in the record that Soto or McNeil knew about the contents of Miron's background investigation at this point.  Moreover, Detective Grindrod did not initiate Miron's background investigation until February 10, 2008, several days *after* Soto and McNeil recommended Miron for hire.  To the extent that the Defendants knew that Miron was the Mayor's brother, they could not have learned of this sibling relationship from Miron's background investigation report because the report does not contain this information.  As the record indicates that Miron's report was disseminated only after the Defendants accessed it on March 25, 2008, nearly two months after Soto and McNeil had recommended Miron for a job as an officer, and the report does not contain information as to Miron's sibling relationship, the natural conclusion is that the Defendants did not disseminate Miron's report *because* he was the mayor's brother.

Therefore, as Miron has not provided particularized admissible evidence in the cited record that his background report was released because of his sibling relationship with his brother, as opposed to his inherent unsuitability and lack of qualifications for the job, his First Amendment intimate association claim may not go forward.  *See Jenkins*, 167 F. Supp. 2d at 653 (city human resources

51

administration did not violate First Amendment by interfering with intimate associational rights of director of organization which had contract with administration, when administration insisted upon director's ouster due to fact that his mother was on board of directors of organization's parent, and where director's ability to perform his duties without the appearance of impropriety would be compromised; "[t]here is no indication here that the intent or effect of [defendant]'s action was to 'penalize' [plaintiff's] mother-son relationship for any reason not legitimately connected with [plaintiff]'s official duties in overseeing proper compliance with the relevant provisions of the Agreement"); *Rajaravivarma*, 862 F. Supp. 2d at 168 (professor plaintiff's First Amendment intimate association claim failed where plaintiff did not offer any evidence that his wife's lawsuit was a factor in the decision to deny him tenure beyond the fact that the defendant was aware of the lawsuit); *Adler*, 185 F.3d at 45 (reversing grant of summary judgment for defendants on First Amendment intimate association claim where plaintiff presented substantial evidence that his wife's lawsuit, "not his politics," was the basis for his discharge, including that "[o]ne of his supervisors in the week before discharge reportedly mentioned his wife's litigation and the embarrassment it was causing state officials," a memo issued the week before his discharge declaring that there would be no further dismissals within plaintiff's department, and evidence that employees similar to the plaintiff were not terminated); *Talley*, 08 CV 790 DRH ETB, 2012 WL 3841396 (denying summary judgment on intimate association claim where plaintiff provided specific evidence – including public comments made by the board members in

question – that members of the board had abstained from a vote on whether to hire plaintiff for a teaching position, thereby denying plaintiff the position, because they harbored enmity towards plaintiff's father who was a member of the board, despite plaintiff's technical qualifications for the position).

As a last note, the court addresses various evidentiary arguments that the Defendants make in support of summary judgment: (1) that the Plaintiff cannot prove that the Defendants released Miron's background report, and (2) that in contrast to their lack of motive to harm Mr. Miron, "ample evidence" exists as to Captain Popik's belief that the SPD should not hire Miron.  First, there are genuine issues of material fact in dispute as to whether the Defendants released Miron's background report to the public which prevent summary judgment in favor of Defendants on this basis.  Second, while evidence of Popik's reservations about Miron's hire appear in the record, the determination of whether Captain Popik or the Defendants disseminated Miron's background report to the Council and the media is not an issue for the court to decide.  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Redd v. New York Div. of Parole*, 678 F.3d 166, 173-74 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  It is well established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Redd*, 678 F.3d at 174; *Aceto v. Town of Bloomfield*, 3:04CV01877 (AWT), 2006 WL 1405579 (D.

Conn. May 19, 2006).  Thus, neither of these arguments is sufficient to warrant summary judgment in favor of Defendants on Plaintiff's deprivation of the right to association claim.  Nonetheless, Defendants' arguments are moot as Plaintiff has not proffered sufficient evidence to support a claim of deprivation of his intimate association rights.

In sum, Miron has not established a violation of his right of intimate association under the First Amendment.  As the Plaintiff has failed to proffer sufficient evidence of any constitutional violation, summary judgment is GRANTED as to his 42 U.S.C. § 1983 claims.

## VI.    State Law Claims

Having granted summary judgment as to the federal law claims against the Defendants, the court declines to exercise its supplemental jurisdiction over the Plaintiff's state law claims.  "Supplemental or pendent jurisdiction is a matter of discretion, not of right.  Thus, the court need not exercise supplemental jurisdiction in every case." *Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 165-66 (D. Conn. 2005) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 715-26 (1966)). "The federal court should exercise supplemental jurisdiction and hear a state claim when doing so would promote judicial economy, convenience and fairness to the litigants.  The court should decline to exercise supplemental jurisdiction, however, when state law issues would predominate the litigation or the federal court would be required to interpret state law in the absence of state precedent. In addition, the court may decline to exercise supplemental jurisdiction where the

court has dismissed all claims over which it has original jurisdiction." *Id.* (citing 28 U.S.C. § 1367(c)(3)); *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims").

Because the court has granted summary judgment for Defendants McNeil, Soto and Farmer on Plaintiff's 42 U.S.C. § 1983 claims, over which it has original jurisdiction, this Court declines to exercise supplemental jurisdiction over Miron's remaining claims, all of arise under state law. *See Zito v. Fried, Frank, Harris, Shriver & Jacobson LLP*, 09 CIV. 9662, 2012 WL 2333303 (S.D.N.Y. June 19, 2012) (citing *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d. Cir.1994) ("Under 28 U.S.C. 1367(a)(c), a Court has the discretion to exercise supplemental jurisdiction over pendent state law claims.  If, however, 'the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.'")).

VII.   <u>Conclusion</u>

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.  Summary judgment is GRANTED in favor of Defendants as to Plaintiff's federal constitutional privacy and intimate association claims pursuant to 42 U.S.C. § 1983 (counts 1, 2, 3, 5, 6, and 7).  The court declines to exercise supplemental jurisdiction over Plaintiff's state law

claims.  The Clerk is directed to enter judgment in favor of Defendants on Plaintiff's federal claims and to close this file.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: September 30, 2013